**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SHUNDELL L. DICKERSON** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Civil No. 3:14-cv-1717** |
| | ) | **Judge Campbell/Frensley** |
| **DEBORAH JOHNSON, WARDEN** | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## I.
## INTRODUCTION AND PROCEDURAL HISTORY

Shundell Dickerson ("Petitioner"), a state prisoner, has filed a Second Amended Petition under 28 U. S. C. § 2254 seeking a Writ of Habeas Corpus to set aside his conviction for facilitation of murder in which he received a sentence of 60 years arising out of the fatal shooting of Eric Johnson. Docket No. 34.

Petitioner's Second Amended Petition includes claims of ineffective assistance of trial and appellate counsel, that the state withheld impeachment evidence in violation of *Brady v. Maryland*, 373 U. S. 83, 87 (1963), and challenges the sufficiency of the evidence of his guilt. Docket No. 34. Respondent filed a Response to the Second Amended Petition. Docket No. 40. The Court allowed Petitioner to conduct certain discovery (Docket No. 52, 57 and 62) and granted Petitioner's request for an evidentiary hearing. Docket No. 70.

On October 3, 2019, the Court held an evidentiary hearing. Docket No. 83. At the hearing Petitioner's trial and post-conviction counsel testified. Docket No. 84. On November 7, 2019, Petitioner filed a Post Hearing Brief. Docket No. 85. Respondent submitted a Post Hearing Brief on December 20, 2019. Docket No. 89. Petitioner filed a Reply on January 3, 2020. Docket No. 90. The matter is now ripe for decision.

For the reasons discussed below, the undersigned recommends that Petitioner's Habeas

Corpus Petition be DENIED.

## II.
## FACTUAL BACKGROUND

In denying Petitioner's request for post-conviction relief after rehearing, the Tennessee

Court of Criminal Appeals summarized the evidence submitted at trial as follows:

> Stormy Woods testified that on the afternoon of October 19, 2003, she went shopping with her friend Rhonda Thompson and Ms. Thompson's friend Eric Johnson. Ms. Woods was parked outside of a strip mall, waiting on Ms. Thompson and Mr. Johnson to return to the car from the store. When they returned to the car, "[j]ust as [Ms. Thompson] had opened the passenger side door a car came from behind [them] and started shooting." Ms. Woods saw Mr. Johnson get shot and fall to the ground. She testified that she saw the shooter in the driver's seat of the car, which she described as a newer, four-door, dark green car. She could not tell if anyone else was in the car. She described the shooter as a "medium skinned, African–American man, ... around mid to early twenties." He was wearing a sports jersey, and he had a black bandana on his head. When the shooting stopped, Ms. Thompson got inside the car and Ms. Woods drove away. Ms. Thompson told Ms. Woods to leave Mr. Johnson there. They drove to a friend's house, and the friend called the police. When the police arrived, Ms. Thompson was taken to the hospital. Ms. Woods testified that her car had four or five bullet holes in the passenger side. She was not able to identify Petitioner as the shooter, and she did not see anyone besides the shooter inside of the vehicle.

> Rhonda Thompson testified that as she and Mr. Johnson approached Ms. Woods' car, a dark-colored car with tinted windows "drove up and started shooting." She testified that the driver's side window was down and she saw one person firing a gun. Ms. Thompson was unable to identify the shooter, but she testified that the shooter was African American and "light skinned." Ms. Thompson also testified that she saw one other person inside the vehicle.

> Officer Terry Burnett, of the Metro Nashville Police Department, responded to the scene of the shooting. When he arrived, he saw Mr. Johnson lying on the ground and "bleeding extremely bad." He also saw several shell casings on the ground. An ambulance arrived and transported Mr. Johnson to the hospital.

> Dr. Feng Li, an assistant medical examiner for Davidson County, testified that Mr. Johnson suffered six gunshot wounds. Dr. Li recovered three projectiles from Mr. Johnson's body. The cause of his death was multiple gunshot wounds and the manner of death was homicide.

2

Tameka Buchanan witnessed the shooting. She was leaving the parking lot when she heard gunshots. She saw two cars fleeing the scene. One of the cars was driven by "two white girls," and the other was a black Monte Carlo with tinted windows. She could not see who was inside the Monte Carlo.

Alice Douglass, Ms. Buchanan's sister, testified that she was at the shopping center with Ms. Buchanan when the shooting occurred. She heard gunshots and turned and saw a black Monte Carlo with tinted windows speed away. Ms. Douglass testified that while Ms. Buchanan tended to Mr. Johnson, she went into a nearby store to use the telephone. She testified that the same black car drove by again, "[l]ooked at the body, whatnot, the guy. And said he didn't know that fool—they didn't know that fool. And then they left." Ms. Douglass testified that there were two black males inside the car. The driver had braids, and the passenger had a blue bandana around his face.

Katrina Frierson had two children with Petitioner. She testified that Petitioner told her that he killed Mr. Johnson. Ms. Frierson testified that in her initial interview with detectives, however, she did not state that Petitioner had told her that he killed Mr. Johnson. She testified that she did not tell detectives initially because Petitioner had threatened to "take [her] kids." On cross-examination, she testified that she had been charged with four counts of aggravated robbery. She was released from jail after her bond was reduced, which was after she agreed to testify in this case.

Ms. Frierson testified that Petitioner told her "that somebody had to pay." Petitioner told her that he had followed Mr. Johnson to a shopping center and "emptied his clip on him" when he came out of the store. He told her that Mr. Johnson was with "a white girl." He said that he was with "a couple of his home boys." She testified that Petitioner was "scared" and that he told her "that if anything happened to him to make sure [she] took care of his kids ."

Ms. Frierson also testified that on October 24, 2003, Petitioner shot her television in her bedroom with a nine-millimeter handgun. A neighbor heard the gunshot and called the police. When the police arrived, they found Petitioner hiding in her closet. She acknowledged that she initially lied to the police about Petitioner being in her home.

Officer Jacob Pilarski, of the Metro Nashville Police Department, responded to the incident at Ms. Frierson's house. When he arrived, he observed that the television "appeared to be broken, shattered. The tube was shattered." He found "one spent shell casing" from a nine-millimeter behind the television.

Officer Michael Pyburn, of the Metro Nashville Police Department, examined three projectiles and eight shell casings that were recovered from the scene of the shooting. He determined that two of the three bullets recovered from the scene were nine-millimeter bullets that were fired from "an unknown firearm."

The third bullet was a .45 caliber bullet that was fired from "a second unknown firearm." Officer Pyburn testified that seven of the eight discharged cartridge cases were Winchester .45 auto cartridge cases, and one was a discharged Remington nine-millimeter Luger cartridge case. He also examined the three projectiles that were recovered from the victim's body. One was a nine-millimeter projectile, which had insufficient markings to determine from what firearm it was discharged. The other two were .45 caliber projectiles that were fired from the same unknown .45 caliber firearm from which the projectiles found at the scene were fired. Officer Pyburn also examined the nine-millimeter shell casing found in Ms. Frierson's home and determined that it was discharged by the same unknown nine-millimeter handgun that fired the nine-millimeter bullets and shell casings found at the crime scene. Officer Pyburn testified that "at least two different firearms" were fired at the crime scene.

Tamara Elliott, Clarence Elliott's wife and Eric Johnson's cousin, testified that on September 20, 2003, she was present when Mr. Elliott shot Terrence Gregory in their yard. She testified that Mr. Johnson was across the street painting. Ms. Elliott did not call the police after that incident. She testified that she learned from Petitioner that Mr. Johnson had been killed approximately two days after the shooting, when Petitioner went to her house and told her he "knocked [the victim] off." On cross-examination, Ms. Elliott did not tell detectives that Petitioner had admitted to her that he shot Mr. Johnson when she initially met with him. She also testified that she learned about Mr. Johnson being killed by "some woman on the street."

Terrence Gregory testified that he was with Petitioner and Petitioner's brother Montez Dickerson when Mr. Gregory was shot four times by Clarence Elliott on September 20, 2003. Petitioner had told Mr. Gregory that Mr. Elliott "wanted to buy some coke." Mr. Gregory believed that Petitioner and Montez Dickerson had set him up to be shot by Mr. Elliott. Mr. Gregory testified that he was incarcerated with Petitioner, and Petitioner told him that he did not set him up to be shot and that Mr. Johnson was one of the people who shot Mr. Gregory. Petitioner told Mr. Gregory that "he wasn't going to let him slide with that so he knocked him off."

Dawn Dickerson, Petitioner's sister-in-law, testified that Petitioner lived with her and Montez Dickerson in 2003. She testified that she was with Petitioner on the day of the shooting. She testified that they were at home that morning, and that night, they were at Lacreissa Newbell's house for a birthday party for Montez Dickerson. They went to Ms. Newbell's house in the afternoon and stayed until after 11:00 p.m. She testified that she had never seen Defendant carrying a nine-millimeter handgun.

Lacreissa Newbell testified that she had a party at her house for Petitioner on the date of the shooting. She testified that Petitioner arrived with Montez and Dawn Dickerson sometime between 3:00 and 4:00 p.m.

4

# III.
## ISSUES PRESENTED FOR REVIEW

In the instant Amended Petition, Petitioner raises four separate claims for relief:

 1.     Ineffective assistance of trial counsel based on the failure to use available evidence to impeach key state witnesses and utilize evidence favorable to the defense.

2.     Violation of Petitioner's due process rights under *Brady v. Maryland* by prosecutorial misconduct for withholding evidence and impeachment material favorable to petitioner.

3.     Ineffective assistance of appellate counsel by failing to argue sufficiency of the evidence.

4.     Insufficiency of the evidence.

Docket No. 34, pp. 23-28.

The Parties agree that Petitioner's issues regarding Appellate counsel and sufficiency of the evidence were properly exhausted in the Tennessee State Courts. They likewise agree that Petitioner's claims for ineffective assistance of trial counsel and prosecutorial misconduct are procedurally defaulted. Petitioner contends that he can overcome procedural default and that he ultimately prevails on the merits of his claims while respondent contends that Petitioner has failed to establish prejudice and failed to show his claims are substantial and accordingly, the Court should dismiss those claims as procedurally defaulted.

# IV.
## LAW AND ANALYSIS

### A.     Standard of Review

Because Petitioner filed his application for habeas relief after April 24, 1996, his amended petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 214 (1996). The AEDPA amended the standard for granting habeas relief as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). With regard to the former, a state court's decision is "contrary to" clearly established law if it " 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.' " *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), *quoting Williams*, 529 U.S. at 405-06. As to the latter, "an *unreasonable application* of federal law is different from an *incorrect application* of federal law." *Williams*, 529 U.S. at 410 (emphasis added). A federal habeas court making an " 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively unreasonable*." *Id.* at 409 (emphasis added). The phrase "clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta" of Supreme Court decisions at the time of the relevant state court decision. *Id.* at 412.

To obtain habeas relief from a federal court, a habeas petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there

6

was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Where state courts have made factual determinations regarding issues presented for federal habeas corpus review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Under the AEDPA, the purpose of habeas review is to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B.    Procedurally Defaulted Claims

Before a federal court may review a claim raised in a habeas petition, it must be determined whether the petitioner has exhausted the remedies available in state court. 28 U.S.C. § 2254(b)(1). A federal court shall not grant an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgement of a state court unless the applicant has exhausted the remedies available in courts of the state, the applicant has no state corrective process, or the process is ineffective to protect the rights of the applicant. 28 U.S.C. § 2254(b)(1)(A)-(B).

To properly exhaust available state remedies, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In the State of Tennessee, a petitioner need not file an application for permission to appeal to the Tennessee Supreme Court to exhaust all state remedies; an appeal to the Tennessee Court of Criminal Appeals is sufficient. Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F. 3d 398, 402 (2003) (holding that Rule 39 removes Tennessee Supreme Court review as an antecedent for federal habeas review). Further, in order to properly exhaust a habeas claim in state court, "a petitioner

must assert both the legal and factual basis for his or her claim." *Williams*, 460 F. 3d at 806. To satisfy this requirement, and avoid a procedural default, a petitioner's federal habeas claim must be based on the same theory presented in state court and cannot be based on a wholly separate or distinct theory. *Carter v. Mitchell*, 829 F. 3d 455, 461 (6th Cir. 2016); *Wong v. Money*, 142 F. 3d 313, 322 (6th Cir. 1998).

The procedural default doctrine provides that if a petitioner fails to satisfy independent and adequate state procedural requirements, he forfeits his right to present his claims on federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted, but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. *Woodford v. Ngo*, 548 U.S. 81, 126 (2006).

In those cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of any such claim is barred "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750. Whether a petitioner has established cause "must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish actual

8

prejudice, a petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis original). With regard to a fundamental miscarriage of justice, a petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (internal quotation marks omitted), *quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 401 (internal quotation marks omitted), *quoting Schlup*, 513 U.S. at 316.

### 1. Ineffective Assistance of Counsel Claims

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *see generally Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). The right to effective assistance of counsel extends to representation in a direct appeal as of right. *Evitts*, 469 U.S. at 398. To substantiate a claim that his counsel was ineffective, a petitioner must prove: (1) that his "counsel's performance was deficient" and (2) that his counsel's "deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

In establishing that a petitioner's counsel was deficient, it must be shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner]

by the Sixth Amendment." *Id.* In other words, counsel's performance must have fell "'below an objective standard of reasonableness.'" *Campbell v. Coyle*, 260 F. 3d 531, 551 (6th Cir. 2001) (quoting *Strickland*, 466 U.S. at 688). The standard for measuring performance under the deficiency prong is "'reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Measuring counsel's performance requires deference to be given to counsel's decisions, including "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Accordingly, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Further, proving prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, a petitioner must show "by 'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different.'" *Sylvester v. United States*, 868 F. 3d 503, 511 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this showing, "[i]t is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

Petitioner asserts that trial counsel were ineffective by failing to use readily available evidence and information to rebut the claimed ballistics match in this case. Docket No. 85, pp. 13-19. Dickerson argues that his conviction "rested solely on the proposition that Dickerson shot a television in Frierson's home five days after the murder using the murder weapon. *Id.* , p. 14.

Petitioner states that "counsel did not challenge the claimed ballistics match even though she could have with evidence and information that was readily available." *Id.* at p. 15.

Petitioner first contends that counsel should have argued that officers saw multiple shell casings in Ms. Frierson's home but only collected and tested one casing. *Id.* He argues that had this proof been highlighted it would have undermined the state's theory because it "could have proven that it would be far from certain - indeed, it would even be statistically unlikely - that Dickerson was responsible for the casing collected on October 24th at Frierson's residence. *Id.* Petitioner second argues that counsel was ineffective for failing to cross examine Officer Pyburn to establish the weaknesses of his methodology regarding the ballistics examination he conducted of the spent shell casing. *Id.* at pp. 15-16. He argues that each of these attacks reinforce the other to undermine the state's key premise about Dickerson having possessed the murder weapon on October 24th. *Id.* at p. 18.

Based upon both his arguments and the admissions of trial counsel at the evidentiary hearing that they should have made use of the arguments advanced in the Petition; trial counsel was deficient. Docket No. 90, pp. 3-4. Petitioner contends that absent the deficient performance, there was a "reasonable probability of a different outcome and thus the Court should find that the deficient performance was prejudicial." *Id.* at p. 9.

Dickerson explains that he can overcome default on this issue under *Martinez v. Ryan*, 566 U.S. at 1, 11 (2012), because he has presented a winning claim of ineffective assistance of trial counsel which should have been raised but was not by his post-conviction lawyer. Docket No. 85 p. 19. Thus, Petitioner argues that *Martinez* excuses the default and the Court should review the issue *de novo* and grant the relief requested.

### a.    The Multiple Casings Issue

Among the evidence connecting Petitioner to the murder of Eric Johnson was the testimony of Officer Michael Pyburn establishing a match between a shell casing allegedly discharged by Petitioner days after Johnson's murder in the home of Katrina Frierson and a shell casing recovered from the scene of the murder. Petitioner argues that the unreliability of other evidence connecting him to the murder magnified the importance of the ballistics evidence and testimony from Officer Pyburn. He contends that his trial counsel were deficient for failing to highlight and argue that evidence which would have cast doubt on the ballistics testimony.

It is undisputed that multiple shell casings were recovered at Frierson's residence. Docket No. 23-1, p. 94; Docket No. 23-31. Nonetheless, only one casing, a nine-millimeter, was collected at the scene for testing. Docket No. 23-31, p. 2.

At trial, the state's poof of guilt rested on three witnesses claiming he had confessed to the murder and ballistics evidence that connected him to one of the murder weapons several days after the murder.  Docket No. 85, p. 5. The defense strategy was to attack the credibility of the witnesses based on prior inconsistent statements, their ill will towards Petitioner and benefits they would receive for cooperating against Petitioner. *Id.* Additionally, counsel offered alibi witnesses to establish that Dickerson could not have been the shooter. *Id.*  With respect to the ballistics evidence, counsel sought to cast doubt as to whether Dickerson was the individual who fired the shot responsible for creating the spent casing at the Frierson residence utilized by Officer Pyburn to link the Petitioner to the murder weapon. *Id.* at p. 6. Petitioner now argues that counsel was ineffective for  failing to argue because only one of the multiple casings at the Frierson's residence it was unlikely the casing produced by the actions of  Dickerson. *Id.* Specifically, Petitioner argues that counsel failed to notice changes in the investigating officer's testimony about shell casings

recovered at the Frierson residence. *Id.* at p. 15. While the officer initially reported and testified that multiple shell casings were found, his trial testimony only referenced one shell casings and only one of the casings was collected. *Id.* at p. 15. Petitioner contends that had counsel pursued this line of questioning, she could have established that there was only a 25% chance that the gun shot produced the casing that matched the casing in the Johnson shooting. *Id.* This would mean that the casing collected on October 24 could have been produced by anyone at any time prior to that date. *Id.* This, Petitioner contends, could have significantly undermined the state's theory by proving that it would be far from certain and probably unlikely that Dickerson was responsible for the casing collected on October 24. *Id.*

Respondent argues that the jury was aware that there were multiple casings but only one was collected. Docket No. 89, pp. 9-10. Respondent notes that counsel asked the officer multiple times about "shell casings" found in the bedroom at the Frierson residence. *Id.* Importantly, the officer testified he did not have personal knowledge of whether a shot was fired on the night of October 24, 2003 and had no knowledge of as to "how long the shell casings were actually at that duplex." *Id.* citing Docket No. 23-2, p. 24. Respondent argues that based upon this cross examination, the jury was able to consider that there were multiple shell casings found at the Frierson residence and that officers were not able to determine when the shots were fired that produced the casings. *Id.*

In reply, Petitioner contends that the non-specific reference to "casings" "is a far cry from what competent counsel would have established for - and argued to - the jury. . ." as now admitted by trial counsel. Docket No. 90, p. 3. Petitioner argues that counsel's lack of specificity to address the distinction between Strickling's testimony about a casing versus casings did not in fact, establish that multiple casings were present. *Id.* He argues it "unreasonable" to claim that

Strickling's responses, which ignored the fact – not- in – evidence part of the questions, established for the jury the very important but otherwise unproven fact that he had found multiple casings at the scene." *Id.* Apart from establishing there were four rather than one shell casing, counsel could have argued to the jury that there was only a 25% chance that the "matched" casing was produced by the shooting on October 24, 2003. *Id.* Petitioner further points to counsel's admission that she should have used the multiple casings evidence and that not doing so was a mistake, therefore her performance was deficient. *Id.*

Petitioner argues that he was prejudiced by the deficient performance because had counsel addressed this issue at trial, "there is a reasonable probability that the jury would have concluded there is only a 25% chance that the right casing was collected from the Frierson scene, and hence only a 25% that the claimed match has, with respect to Dickerson, any significance whatsoever." *Id.* at p. 8. The sum of Petitioner's argument is that counsel should have done a better job calling into question the alleged fact that he was the shooter who created the shell casing recovered from the Frierson residence used to match the murder weapon.

While Petitioner disagrees with the method used by counsel, it is clear that this is exactly what counsel attempted to do in this case. By arguing that it was unreasonable Dickerson would have fled the duplex and then returned to the duplex to be arrested  was an effort to challenge the contention that Dickerson fired the weapon on October 24. Likewise, counsel established that Officer Strickling had no personal knowledge of whether a gun was fired in the Frierson residence that night and that he had no idea how long the shell casings had been at the duplex. Docket No. 23-2, pp. 23-24.

The court's task is "not to grade counsel's performance," Strickland, 466 U.S. at 697, 104 S. Ct. at 2069, or ask whether the attorney could have performed better, or ask whether some novel,

unenacted strategy might have led to a better outcome for the client. Strickland addresses only the small class of cases in which "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment" at all, 466 U.S. at 687, 104 S. Ct. at 2064, and does not operate as a catch-all mechanism for "fixing" trials we might have conducted differently. *See White v. Singletary*, 972 F. 2d 1218, 1221 (11th Cir. 1992) ("[W]e are interested in whether the adversarial process at trial, in fact, worked adequately.").

The cross-examination of witnesses falls within the area of tactics or strategy that courts typically do not attempt to second guess. "The cross-examination of a witness is a delicate task; what works for one lawyer may not be successful for another. Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Henderson v. Norris*, 118 F. 3d 1283, 1287 (8th Cir. 1997). Further, "[i]mpeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002).

This was a complicated case. Petitioner had the benefit of two experienced lawyers who devoted significant time to investigation and preparation of his defense. Counsel had access to all of the relevant reports and adequate time to prepare the defense in this case. It is clear that counsel was aware that there were multiple casings found based both upon her review of the report and questioning of Officer Strickling. When measured against the objective standard as the Court must, one cannot conclude that counsel performance was deficient. While the strategy and specific questions asked of the witnesses could have been different and might have been better, it does not follow that the performance was deficient. In fact, trial counsel's strategy was identical to the strategy Petitioner suggests should have been followed. The only difference is in the execution.

15

As with any trial and with any witness, hindsight would allow even the participating lawyer to conclude they could have been more effective in their examination of a given witness. This however is not the standard for relief. If it were, every single case would be reversed. Applying the standard as the Court must, counsel was aware of the evidence regarding the shell casings found at the Frierson residence and attempted to cast doubt about whether Mr. Dickerson created the casings. Additionally, counsel sought to challenge the credibility of Ms. Frierson to further the defense strategy that Dickerson was not responsible for the shell casings found. The Court cannot conclude that this strategy or counsel's performance was deficient. As a result, Petitioner cannot show cause or actual prejudice to excuse the procedural default of this claim and recommends that relief on this claim be DENIED.

       **b.**       **Cross examination of Officer Pyburn.**

Following the recovery of the shell casing at the Frierson residence, the detective requested a comparison of the nine-millimeter casing recovered from the Frierson residence to the nine-millimeter casing recovered from the Johnson murder scene. Docket Nos. 22-23. Michael Pyburn was a then 32-year veteran with the Metropolitan Nashville Police Department ("MNPD"). Docket No. 23-8, p. 31. The previous four years he had been assigned to the identification section as a firearm and tool mark examiner. *Id* at p. 32. At trial, he was qualified as an expert in firearm and tool mark identification without objection. *Id.* at p. 35. He testified that in most cases where you have two or more shell casings you can determine whether those shell casings came from the same gun even without the gun. *Id.* at p. 40. Pyburn testified that the particular nine-millimeter shell casing recovered from the Frierson residence was discharged by the same nine-millimeter handgun as the casing recovered from the scene of Mr. Johnson's murder. *Id.* at p. 47. On cross examination, trial counsel questioned Officer Pyburn about the projectiles and casings recovered from the

murder scene establishing that he could not connect the projectile recovered from the autopsy with the shell casing recovered at the scene and could not determine the time when bullets were fired based on forensic testing of the available casings and projectiles. *Id* at pp. 48-49.

Petitioner contends that his trial counsel was ineffective for failing to challenge the "match" testified to by Officer Pyburn. Docket No. 34, p. 16. Petitioner asserts that had counsel investigated expert testimony on the ballistics "match" there was a plethora of information that would have allowed counsel to challenge Officer Pyburn's findings and create a record allowing them to argue that his claim of a match was unreliable. *Id.* at pp. 16-20. He argues that by undermining the certainty of Officer Pyburn's claimed match, Petitioner's possession of the murder weapon shortly after the murder would be called into question and there was a reasonable probability that a jury would have declined to find him guilty. *Id.* at p. 26.

Petitioner was represented at trial by the Metropolitan Nashville Public Defender's office. As is the practice of that office, two lawyers were assigned to the representation since it was a murder case. Docket No. 84, p. 21. Petitioner's lead counsel had been licensed and working for the public defender's office since 1999. *Id.* at p. 20. Petitioner's other attorney had been with the office since 1996, was a team leader and was responsible for supervising other public defenders and their caseloads. *Id.* at p. 46. The two experienced trial lawyers worked together to investigate the case and develop the trial strategy.

Apart from a short break in service, Petitioner's counsel who handled the examination of Officer Pyburn was employed with the Public Defender's office from 1996 until 2018. *Id.* She had experience in handling both trial and appellate matters and at the time of this representation was a team leader within the office, carrying a case load of 50 to 60 active felony cases and supervising three lawyers and their similar caseloads. *Id.* at p. 46. Based on her experience, she was

knowledgeable about the ability to obtain experts as a public defender and testified that at the time "it didn't even occur to us . . . that there was anything that could be challenged about ballistics as a real science." *Id.* at p. 47. She testified that "in 2005, in our practice in Nashville's public defender's office, I don't think it even occurred to us that this was something that could legitimately really be challenged." *Id.* Counsel explained the process for obtaining an expert and indicated that process did not impose any impediment to doing so had she wished to. *Id.* at pp. 47-48.

At the evidentiary hearing, trial counsel testified that both lawyers met with Officer Pyburn prior to trial to discuss the ballistics evidence. Docket No. 84, p. 26. Counsel spoke with Mr. Pyburn about what constituted a match in his mind and the process used for reaching that conclusion. *Id.* He indicated that the standard for making a match of that nature was subjective. *Id.* pp. 27-28. After discussing multiple aspects of Officer Pyburn's conclusions and methodology, counsel left that meeting feeling that methodology could not be attacked. *Id.* at pp. 28-29, 47. Following the meeting and reaching that conclusion, counsel did not take any action to determine methods by which an alleged ballistics match could be attacked. *Id.* at p. 29.

Counsel further testified that she recently became aware of a published article that would have been available to her at the time of trial which points out significant issues and problems with ballistics and tool mark examinations and outlines information that would have been useful in challenging the conclusions that Officer Pyburn made in the case. *Id.* at pp. 30-31. Counsel further testified that she should have recognized that Officer Pyburn's methodology could be attacked through cross examination and the decision not to pursue such an attack was not made for strategic reasons. *Id.* at p. 37.

Respondent argues that the record demonstrates counsel adequately prepared for Officer

18

Pyburn's testimony and knew that they could have requested an expert to challenge Officer Pyburn's findings if they thought it necessary. Docket No. 89, p. 10. She argues that a strategic choice was made on how to address Officer Pyburn's conclusions. *Id.* Respondent contends that considering counsels' conduct from their perspective at the time, Petitioner has failed to show that performance was objectively unreasonable. *Id.* at p. 11. Respondent further argues that even if trial counsel were deficient, Petitioner has failed to present any evidence to undermine the validity of the ballistics evidence. *Id.* at p. 12. Respondent points out Petitioner has not presented evidence showing the ballistics match testified to by Officer Pyburn was incorrect. *Id.* at p. 13. Respondent argues that without such evidence, Petitioner cannot show any prejudice based on trial counsel's cross examination. *Id.* Therefore, Respondent contends that the Court should dismiss Petitioner's claims on this issue.

In reply, Petitioner argues that the record establishes that the decisions regarding the cross examination of Officer Pyburn were not strategic and therefore deficient. Docket No. 90, pp. 4-5. He argues that it may be "more powerful to have an expert testify to a non-match, . . . but that type of testimony is not necessary to coherently attack Pyburn's methodology and hence his claimed match." *Id.* p. 8. Instead, Petitioner argues that trial counsel left Pyburn's match wholly unchallenged which resulted in prejudice. *Id.* at p. 9.

As with the multiple casings issue, Petitioner's argument represents classic Monday morning quarterbacking. While it is certainly possible to argue that trial counsel could and perhaps should have taken a different approach to Officer Pyburn; the same can be said about the examination of any witness at any trial. What is significant in this case is that Petitioner was represented by two experienced lawyers who were aware of the resources available to them. They spent significant time in preparation for the trial of this case including reviewing the relevant

reports and interviewing the witness himself. While in hindsight it may have been a "mistake" to choose the approach taken by counsel, it was in fact a choice. While counsel now contends it was a mistaken choice, the testimony establishes that it was a choice believed to be objectively reasonable at the time. The Court notes that as an institution, the public defender's office is responsible for a large percent of representation of criminal defendants in the trial courts. According to trial counsel, it did not occur to the Nashville Public Defender's office that this was something that could legitimately be challenged. Docket No. 84, p. 47. As such, applying the objective standard required, the court cannot conclude that counsel's performance was deficient.

Even if counsel's performance was deficient, Petitioner cannot establish prejudice. At the end of the day, Officer Pyburn's testimony would still be admissible and would still be the only expert proof on the issue. Even if the jury had discounted or rejected Pyburn's testimony, there was other proof connecting Petitioner to the firearm, his statements admitting involvement and the rejection of his alibi defense. Petitioner has failed to point to any case law where relief was granted based on trial counsel's failure to use a specific cross examination technique without having subsequently obtained expert proof that would contradict the expert's opinion. Petitioner does not even challenge trial counsel's decision not to obtain an expert nor has he subsequently obtained an expert who would contradict Pyburn's match testimony. In the absence of such proof, it is a bridge to far to say the outcome of the trial would have been different had counsel pursued a different cross examination strategy or that, as a matter of law, this possibility rises to the level of "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052. Because Petitioner has failed to show trial counsel's performance was objectively deficient or resulted in prejudice, he is not entitled to relief on this claim and the undersigned recommends his claims for relief on this issue be DENIED.

### c. Impeachment of State witnesses and evidence favorable to defense

The Amended Petition also alleges that counsel was ineffective for failing to use available evidence to impeach witnesses Katrina Frierson and Rhonda Thompson regarding prior statements and other evidence in conflict with their testimony. Docket No. 34, p. 24. He further contends that counsel was ineffective for failing to present additional alibi testimony and "other favorable evidence." *Id.* at p. 25. The Parties agree that the claim regarding evidence to impeach Katrina Frierson was properly exhausted, but the other claims were defaulted. Docket No. 64, pp. 1-2.

With respect to the Frierson claims, Respondent argues that the Court of Criminal Appeals evaluated this issue and concluded that the statements were not necessarily inconsistent, and Petitioner had not shown prejudice as a result of failure of counsel to impeach Frierson with them. Docket No. 40, p. 17. Respondent contends that Petitioner has failed to present evidence to overcome the presumption of correctness afforded the State Court and that conclusion was reasonable in light of the evidence and in accord with *Strickland. Id.* at p. 18. With respect to the other issues, Respondent contends that the Petitioner failed to establish any explanation for the default or proof of actual prejudice and therefore these claims must likewise be dismissed. *Id.* at pp. 20-21.

As noted above, counsel appreciated the significance of the testimony of Ms. Frierson and vigorously cross examined her as well as Ms. Thompson and the other witnesses. Petitioner has offered no reason to unsettle the decision of the State Court with respect to the claims regarding Ms. Frierson's examination, Petitioner's counsel likewise identified his alibi defense and vigorously advanced that defense. Petitioner cannot establish counsel's performance in this regard was deficient and therefore cannot overcome procedural default. Because Petitioner is not entitled to relief on these claims, the undersigned recommends that relief on this issue be DENIED.

### 2. Prosecutorial Misconduct Under *Brady v. Maryland*

The Petitioner alleges the state violated *Brady v. Maryland,* 373 U. S. 83, 87 (1963) by withholding evidence of impeachment material favorable to Dickerson. Docket No. 37, p. 26. Specifically, he argues that the State withheld information that Officer Pyburn routinely ignored quality control standards and procedures in his ballistics testing. *Id.* The Court authorized limited discovery on this issue allowing Petitioner to take the depositions of Officer Pyburn and Police Chief Steve Anderson. Docket No. 57, 62. Petitioner contends that discovery revealed it was more likely than not that Pyburn made a misidentification in 2000 by confusing two bullets of different calibers. Docket No. 64, p. 13. He argues that type of misidentification was a significant mistake that would undermine an analyst's future work and should have been disclosed for impeachment purposes to cast doubt upon Pyburn's assertion of a "match" between shell casing in this case. *Id.* Petitioner argues that it is more likely than not the unit responsible for these examinations did not follow a system of independent verification that called into question the procedures utilized by the unit. *Id.* They argue that in addition to the materiality of the evidence and the state's obligation to disclose the evidence, *Brady's* prejudice standard is matched in that it would create a reasonable probability of a  different outcome by tarnishing Pyburn's credibility. Docket No. 85, pp. 20-21. Petitioner contends that because his *Brady* claims prevail, he overcomes the procedural default of this issue. *Id.*

The Respondent counters that the Petitioner cannot show that the evidence in question was favorable or material. Docket No. 89, p. 16. She notes "Petitioner's claim is based entirely on an undated, handwritten notation from MNPD Chief Steve Anderson." *Id.* The notation memorializes a mistake found by the TBI of a misidentification by Pyburn in 2000. *Id.* Respondent argues that Petitioner has presented "no proof as to the date the TBI discovered the mistake, how the TBI

discovered the mistake and in what case this mistake was made." *Id.* Neither Chief Anderson nor Officer Pyburn has any further recollection of the issue. *Id.* at pp. 16-17. Respondent contends that the only proof before the Court is that if a mistake was made it was while Pyburn was in training. Respondent argues that it would not be unexpected for someone to make a mistake during training and such a statement would have no impeachment value for a determination made years later after the competition of training. *Id.* Respondent also contends that the evidence is not material because "it does not show that Officer Pyburn's findings in Petitioner's case are incorrect" and "Petitioner has not presented any proof that the shell casing taken from Ms. Frierson's home does not match the shell casing found at the crime scene." *Id.* Because there is no evidence that the analysis in Petitioner's case is incorrect, Respondent argues that there is not a reasonable probability that the result of the proceeding would have been different had the information of a mistake in 2000 been known to Petitioner. *Id.* at p. 18.

"Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Strickler v. Greene*, the Supreme Court set out the three elements necessary to establish a *Brady* violation: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." 527 U.S. 263, 281-82 (1999). A *Brady* violation occurs only if the suppressed evidence is "material," meaning "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

A " 'reasonable probability' is a probability sufficient to undermine confidence in the

outcome." *Id.* The "cause" and "actual prejudice" requirements to excuse procedural default in the habeas context parallel two of the three elements of a *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). With regard to the second element (suppression of evidence by the state), "a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Id.* With regard to the third element (prejudice), "prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.* A *Brady* violation thus "implicitly constitutes a *per se* excuse ('cause' and 'prejudice') for procedural default in habeas review." *Apanovitch,* 466 F.3d at 474, *citing Banks*, 540 U.S. at 691.

While Petitioner's *Brady* claim has some superficial appeal, it falls apart on closer scrutiny and is thus not meritorious. Despite having the opportunity to conduct robust discovery on this issue, Petitioner has been unable to establish any proof as to the date the TBI discovered the mistake of misidentification in the year 2000 or any greater detail about how the mistake was discovered, in what case or the repercussions thereof. Further, Petitioner was unable through the discovery to establish that Pyburn was engaging in routine misconduct before Dickerson's trial. It is undisputed that at best, the record shows the misidentification occurred during Officer Pyburn's training. There is no evidence that Pyburn was disciplined for the misidentification or that there were any other contemporaneous ramifications. The fact that the misidentification occurred during Officer Pyburn's training minimizes its impeachment value. As Respondent argues, it would not be unexpected that a mistake would be made during a training period. More importantly, evidence that Pyburn made a mistake while he was in training would be of limited impeachment value in the instant trial years later after the completion of training. Additionally, Petitioner draws no connection between the alleged mistake in 2000 to anything related to the testing process,

examination or opinions formed by Pyburn in the instant case. In the end, the value of the information would be to establish ballistics determinations can be subjective and based upon the prior mistake, it is possible that Pyburn could have made a mistake in the instant case.

Based on the foregoing, Petitioner cannot establish that the evidence in question is material because it does not show Pyburn's findings in the instant case were incorrect or provide any stronger information for cross examination purposes. Counsel was aware through their interview with Officer Pyburn that his determinations were subjective in nature and certainly could have questioned him about whether he could have made a mistake in his conclusions with or without any evidence of a prior misidentification. Ultimately, there remains no reason to believe that Pyburn's report in the instant case was inaccurate and certainly no evidence to support that conclusion.

As a result, Petitioner has failed to show cause to excuse the procedural default of this claim because he has provided no evidence that the information was material. Petitioner has failed to show actual prejudice for the same reason, such that the *Brady* materiality standard cannot be satisfied. *See Banks*, 540 U.S. at 691. The procedural default of this claim therefore cannot be excused, and the undersigned recommends that the request for relief on this claim be DENIED.

### C. Exhausted Claims

Petitioner properly exhausted claims three and four in the Tennessee State Courts. However, even when a claim has been properly exhausted, the Court may "entertain an application for Writ of Habeas Corpus in behalf of a person in custody pursuant to the judgment of the state court only on the ground that he is in custody in violation of the Constitution or Laws and Treatises of the United States ." 28 U. S. C § 2254(a). A claim asserting a violation of state law even if properly exhausted, is not cognizable on federal habeas review. *Pulley v. Harris*, 465 U.S. 37, 41

(1984).

For the reasons stated below the undersigned finds that the Petitioner's properly exhausted claims do not permit granting a Writ of Habeas Corpus.

**1.      Insufficiency of the Evidence**

Petitioner submits that there is insufficient evidence to support his conviction based on the failure to prove that Petitioner "knew that another person was going to kill Johnson and that he knowingly furnished that perpetrator with substantial assistance. Docket No. 34, p. 28.

In *Jackson v. Virginia*, the Supreme Court set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction:

> . . . [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 318-19 (1979) (internal citations omitted).

Upon review, "all of the evidence is to be considered in the light most favorable to the prosecution." *Id.* at 319. If any rational trier of fact would accept the evidence as establishing each essential element of the crime beyond a reasonable doubt, the *Jackson* standard of review is satisfied. *Coleman v. Johnson*, 566 U.S. 650, 654 (2012).

*Jackson* claims face a high bar on habeas review in federal court because they are subject to two layers of judicial deference. *Id.* at 651. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id.* (internal quotation marks omitted),

26

*quoting Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curium). Second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.' " *Id.*, *quoting Renico v. Lett*, 559 U.S. 766, 773 (2010).

The Tennessee Court of Criminal Appeals reviewed the sufficiency of the evidence on post-conviction appeal on this case. Docket No. 39-17. On this issue, the Court found as follows:

> The proof clearly establishes that the murder was premeditated. Viewed in the light most favorable to the State, a vehicle with at least two individuals inside drove up to where the victims were standing in a parking lot and stopped. At least one gunman fired multiple shots at the victims, and the car then fled the scene. The proof establishes that two weapons were fired, and one of the weapons was used by Petitioner five days after the murder when he shot at Ms. Frierson's television. The State argues that the jury could have reasonably concluded that Petitioner assisted in the murder of Eric Johnson. The evidence that the State relies upon in its assertion that there was proof of facilitation is Ms. Thompson's testimony that she saw two men inside the shooter's car and that one of them was firing a gun; Ms. Douglass' testimony that she also saw two men in the car fleeing the parking lot after she heard gunshots; and Ms. Frierson's testimony that Petitioner told her he was with "a couple of his home boys" when Johnson was killed. The State further asserts that the jury could have found Petitioner's confessions to Frierson and Terrence Gregory, that he killed Mr. Johnson, not credible.
>
> We conclude that although the proof of facilitation is not overwhelming, the jury could have inferred that Petitioner was the second individual in the car, but that he was not the shooter; that one of the weapons used by the shooter to kill the victim was a nine millimeter handgun provided the shooter by Petitioner; and that Petitioner knew that the shooter intended to kill the victim because he was in the car with the shooter and the shooter used his gun to commit the murder. None of the witnesses could identify Petitioner as the shooter. Two witnesses testified that there were two people inside the shooter's car. Ballistics evidence showed that Petitioner was in possession of one of the murder weapons four days after the murder.

Docket No. 39-17

In viewing the evidence in the light most favorable to the state, the undersigned finds that the Tennessee State Court could conclude that the evidence was sufficient to support Petitioner's

conviction. Based on the proof offered at trial, the Tennessee Court of Criminal Appeals'
conclusion that "the evidence was sufficient in this case to sustain Petitioner's conviction for
facilitation of first-degree murder" (Docket No. 39-17 at 7) was not objectively unreasonable and
therefore Petitioner is not entitled to relief on this claim and the undersigned recommends his claim
for relief on this issue be DENIED.

### 2. Ineffective Assistance of Appellate Counsel

The Petitioner contends that his appellate counsel was ineffective for failing to argue the
insufficiency of the evidence under *Jackson v. Virginia,* 433 U. S. 307, 315 (1979), to support his
conviction for facilitation of murder. Docket No. 34, p. 27.

The Tennessee Court of Criminal Appeals addressed this ineffective assistance of counsel
claim on post-conviction appeal under *Strickland.* The Court concluded that since the evidence
was sufficient to sustain the conviction for facilitation of first-degree murder, it could not find
appellate counsel's performance deficient. Docket No. 39-17, p. 7.

The Petitioner has failed to present clear and convincing evidence to overcome the
presumption of correctness on this determination. See, 28 U. S. C. § 2254(e)(1). Based on the
evidence before it, the state court's conclusion was reasonable and consistent with *Strickland.*
Therefore, the undersigned recommends that the Petitioner's claim for Habeas relief upon this
issue be DENIED.

### V.
### RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Petitioner's Amended
Petition for Writ of Habeas Corpus be DENIED and DISMISSED WITH PREJUDICE. The
undersigned recommends that a certificate of appealability be DENIED as to all claims.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days

from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

**JEFFERY S. FRENSLEY**
**U. S. District Magistrate Judge**